will go into Hodges v. Col. Meletis. Council, I think Mr. Rosenmayer is going to argue this case. That's right, Your Honor. Thank you. Good morning. May it please the Court. My name is Steve Alagna on behalf of the appellant Julius Lamart Hodges and it's my pleasure to introduce the law student advocates appearing under Local Rule 46A. So with me at Council table are Matthew Nussbaum, Sidney Everett, and Rudy Rosenmayer. And Mr. Rosenmayer will be presenting the argument for the appellant this morning. We're very happy to have all of you here. Please proceed, Mr. Rosenmayer. Thank you, Your Honor. May it please the Court. Appellant Julius Lamart Hodges filed a pro se complaint in the District Court. Get that Appellant Julius Lamart Hodges filed a pro se complaint in the District Court alleging in pertinent part violations of his Eighth and First Amendment rights. At the 1915 screening stage the District Court dismissed these claims with prejudice. This was reversible error for three reasons. First, the District Court erred in dismissing the Eighth Amendment claim despite Mr. Hodges alleging sufficient facts to meet the two and only two requirements of the Farmer against Brennan framework. Second, even if the District Court was correct to interpret a new involuntariness requirement, the District Court still erred because it improperly drew the inference against Mr. Hodges at the 1915 screening stage. And finally, the District Court erred in dismissing for failure to state a First Amendment claim despite Mr. Hodges' claims causally linking a named appellee to retaliatory conduct for protected speech. For these reasons, we ask this Court to reverse the District Court, remand for further proceedings, and hold that both Mr. Hodges and appellees can properly litigate their case in the Court below. But first, Mr. Hodges did state a claim under the Eighth Amendment for deliberate indifference under the Farmer against Brennan framework. Counsel can just a preliminary matter. Do you concede the mootness of the claim for damages? Yes, Your Honor. We do concede the injunctive relief is moot at this stage, at least with respect to Mr. Hodges. However, as we lay out in our brief, the claim for damages and monetary relief still remains a viable claim so that this Court still has jurisdiction to hear this case. So, with respect to that, okay, on jurisdiction, but you point out that the District Court's order didn't refer to the substantial risk of injury. Is there a viable money damages claim for a substantial risk of injury, Eighth Amendment claim? Yes, Your Honor. He does allege that he wishes for compensation, as JA page 12 indicates, for COVID-19 damages, as well as for back pay relating to his DVOC work. Okay. All right. And this does lead to the fact that Mr. Hodges did, in fact, state a claim that under the Farmer against Brennan framework. As the Supreme Court has held in Farmer against Brennan, there are two requirements that must be met in order for a deliberate indifference claim to be raised. The first is known as the objective prong, and that is that a prisoner must be risk of serious harm. The second is known as the subjective prong, and that's that a prison official had a sufficiently culpable state of mind, which is one of deliberate indifference to inmate health or safety. Mr. Hodges, in his complaint, alleged enough facts to meet both of these standards. But as the District Court ruled, and it appears on JA pages 28 and 29, the District Court erred because it said that Mr. Hodges failed to allege that he suffered... Didn't he want to work in the kitchen so that he would be eligible for work release? Yes, Your Honor. So the prison system was trying to accommodate his wishes? Your Honor, as he alleges in there, he just, the record just simply states that... He volunteered for it. He wanted to work in the kitchen. That was a step up for him. He would be more, he would be eligible for work release. That's a big deal in prisons to establish eligibility for work release. Yes, Your Honor, that would be... And the prison system honored that desire? Yes, Your Honor, it did honor that desire. So is this a question of no good deed goes unpunished? No, Your Honor, this is not a question of no good deed goes unpunished. This is a question of whether or not the prison officials, while also honoring that wishes, made sure to mitigate the substantial risk of serious harm. As the Farmer Against Brennan analysis and Farmer itself says, as long as prison officials take reasonable precautions in order to mitigate a substantial risk of serious harm. So is the effective ruling in your favor for me to communicate to the prison system that they should tread very carefully before they granted an inmate's request to take a particular assignment as a step toward earning work release? Certainly not, Your Honor. What this case would come down to is if the prison officials actually did, in fact, take the substantial steps in order to take reasonable measures to mitigate the risks that were posed to Mr. Hodges or other inmates at the time. And as he alleges in his complaint, the prison officials did not, in fact... Was there any serious injury here? Your Honor, that does not appear in his complaint, but as he states later on that he did, in fact, in his request to leave to amend, he stated that he did, in fact, get COVID-19. However, as this court held, it's not that an inmate has to suffer an actual substantial harm. It's that there is a substantial risk of serious harm. And the risk of COVID-19 was real and present for Mr. Hodges and the eight other inmates working in the kitchen at that point in time. As the J.A. indicates on page 7... So do you agree, this is probably before your time, but there's a famous movie from the 70s that Adam Sandler remade in 2005 called The Longest Yard, right, where inmates volunteer to play football against the guards. And unsurprisingly, in that scenario, people get hurt. So is that, would that state an Eighth Amendment violation? So I agreed to play football as an inmate and then I got hurt doing so. Is that... And in fact, not only did I get hurt, I got hurt because that guard who's on the other team, like hit me, right? I don't mean with a fist, but like he like lined me up and put his helmet between my numbers, right? Is that an Eighth Amendment violation in your view, or is that voluntariness sufficient to absolve the Department of Corrections? Your Honor, in that scenario, it would probably be not enough to meet a farmer against fronting claim. And that's because the presumption... Tell me why not, right. Tell me why not. I hope that you were going to concede that like that's not an Eighth Amendment problem. But why is that different, right? Because we have voluntariness, we have known risks, and the scenarios look quite similar, right? There's a benefit to the football player and the kitchen worker. And those are, you know, unsurprising risks. Yes, Your Honor. However, in that scenario, for instance, if in The Longest Yard, they said, well, you can play football, but you're not going to get a helmet or a pad or anything like that, that would not be taking reasonable steps to mitigate the risk of injury. So it's similar as to this case here. As Mr. Hodges alleges on JA page 8 in his complaint, he says that no contact tracing was done. And when he attempted to raise the alarm bells of this issue, he was rebuffed at every step. The reasonable precautions... No contact tracing. So you would have a say that the failure to use contact tracing is like the equivalent of a helmet in football? I mean, isn't there like some questions about that now? I know at the time people sort of said that, you know, that all of these things were required, but it seems less obvious now in hindsight, doesn't it? It's possible, Your Honor. But at least at the time... For deliberate indifference, right? This is sort of like an objective and subjective, right, standard. And so your argument boils down to the fear to use contact tracing, however that's technically defined, is like having them play football against people in pads with no helmet? Well, perhaps after summary judgment, it would come out that they did in fact take the reasonable measures necessary in order to mitigate the risk. However, the posture of this case is the 1915 screening stage. But all he's alleged in so far as COVID is that in terms of preventive measures is the absence of contact tracing. Doesn't talk anything about masks, doesn't talk anything about distancing. I mean, it's just contact tracing. And he doesn't allege he has any particular susceptibility due to conditions he has. Do you agree with that? At least as it appears in his complaint. Yes, Your Honor. And he doesn't allege that the general prison conditions would present an Eighth Amendment violation. Do you agree with that? The general prison conditions, he does not, no, Your Honor. Okay. So he would be... I mean, is it a fair reading of the complaint that the general prison conditions, which he could go back to if he didn't want this benefit, would not create an Eighth Amendment violation? Your Honor, it's possible that if he were to go to the regular prison conditions, it might not rise to the level of an Eighth Amendment violation. And he could go back to that. Once he saw... Once he got there and said, hey, I wanted this, but I'm worried about COVID, he could have said, hey, I'm going... The risk is too great, I think. I'll just go back to general prison population. And as pled, that wouldn't be an Eighth Amendment violation. Your Honor, nowhere in his complaint, the record is silent completely to whether or not he actually could return to that, those prison conditions at the time. And so that inference, at least at the 1915 screening stage, should not be drawn against Mr. Hodges, at least now. As this court held in Delonte against Angelo, at least for 1915 screening purposes, the Mr. Hodges. Is it really drawing the light most favorable to him to say, once he said, I wanted to be in this, he was permanently confined to this program? That seems... I mean, it's one thing to draw inferences. That seems to create facts to say he, in a voluntary program, effectively was confined. No, Your Honor, we're not suggesting that this court should be creating facts out of thin air. But given the state of the complaint that was before the district court at the time, it at least could have drawn the inferences in the light most favorable to him, as he indicates in JA page 7, that workforce was actually a prerequisite in order to get into work release program. And because of that, he would not have been able to be eligible for work release if he had gone back to the general population. And in fact, that is... Let me ask you, how many thousands of suits would ruling in your favor produce for us? I can see inmates saying, oh, you put me in a cell next to such and such, and such and such, and you insulate the conditions in the recreation and TV room from inmates who you had reason to suspect with COVID, or you put me in a dining room where I was sitting at a crowded table with someone. And that person passed on COVID to me. In other words, there are literally hundreds of situations within a confined facility, such as a prison, where unfortunately, people may be at an elevated risk of contracting COVID. And if we recognize an Eighth Amendment claim for that, every inmate, not only in a kitchen, which naturally is a hot place, but in an undesirable cell, you can say, oh, you double bunked me with somebody who had COVID or did this. It would be unleashing hundreds of suits, and it would drive prison administrators absolutely crazy, because they, like the rest of us in society, were confronted with a highly unusual pandemic, and they were trying to make the best of it, and trying to do what they could under very challenging conditions. And this gentleman, the plaintiff, comes along and said, I was put in a substantial risk of contracting COVID. Yeah, along with everybody else in the facility. I mean, one of the things we have to do is look down the road, and ruling for you, I look down the road, and I see only wave after wave after wave of inmate litigation. There's no end to it. There's no limiting principle to it. That's the problem. You haven't suggested a limiting principle. Why is the kitchen different from this, different from that? Why is, I found Judge Richardson's analogy to the football game, you know, a very good one. You know, there would be untold situations in which somebody would come to court with this kind of claim. Your Honor, respectfully, the subjective prong still serves as that backstop to prevent these kinds of claims unleashed of litigation. And that's because, provided that the prison officials take the reasonable precautions necessary in order to mitigate that risk, then that individual is not having a viable claim. That's not a limiting principle. You can always say, well, they should have known, or they would have tipped off, and lo and behold, we're into, you know, a tribal issue of fact. I mean, it just, there is no limiting principle to your petition. Your Honor, I see that. Counsel, can I ask you one more question before you leave on the subjective prong? Can you point me to the facts that are alleged in the complaint? Not that the prison generally knew about the risk of COVID, but that the specific defendant sued here did? What tells me the substantial knowledge of the COVID risk of Mellitus, I'm not sure if I'm saying that right, Mellitus, West, and Creighton? Not collectively, not the prison as a whole, but those three people? Your Honor, as this Court has held before, circumstantial evidence can be enough to meet the subjective prong. And the circumstantial evidence is that Colonel Mellitus was the one who superintended in charge, as he indicates on JA page 8. And because of that, that knowledge of the COVID-19 and the lockdown that was being done with the rest of the prison population was that obvious circumstantial evidence that was before Colonel Mellitus at the time. And so that knowledge, at least at the 1915 screening stage, can be inferred to be imputed against Colonel Mellitus at that stage. Good. And your position is that we would have to, we would infer there that he knew that contact tracing was vital or necessary to running a kitchen in a prison? Because you've got to make that step too, right? He's got to have some subjective knowledge of the means that you think would have solved this problem, right? That contact tracing was some magic bullet that would have solved the problem. We've got to infer that knowledge too? Your Honor, you don't have to infer that knowledge. You only have to look at JA page 8, in which Mr. Hodges stated that he attempted to raise the alarm bells through the proper chain of command, but was rebuffed at every stage. And so, similar to how a defendant cannot just bury their head in the sand and try to ignore the problem that is before them, they cannot also insulate themselves from these kinds of understanding that reasonable precautions were requested, but were rebuffed. All right. Thank you very much. And you've reserved some time for rebuttal as well. Ms. Poundack, we'd be pleased to hear from you. Thank you, Your Honor. Sharon Poundack, I represent the defendants, Superintendent Miletus, Captain West, and Lieutenant Creighton, Creighton Bay. The court has asked specifically on the issue of whether the contraction of COVID by Mr. Hodges is a violation of the Eighth Amendment. There were other issues that were raised by the appellant, and the appellees addressed those in the brief. And I won't go back to those, except I do want to touch on specifically the district court's determination that it, in fact, looked at both the 12B-6 and it looked at the 28 U.S.C. 1953 standards. And appellant has argued that that's not the case. But if you look specifically at the court's decision, you will see on page 1, page 7, page 10, with respect to the Eighth Amendment issue raised by Hodges, that the court looked and ruled on both aspects of it. So even if you go to the more liberal constructions that have been given to 28 U.S.C. 1915, then you will find that the district court did rule on that, and that decision should be affirmed. What the plaintiff essentially is asking the court to do here, and I appreciate the court's particular notification that the issue of contact tracing not being done is the only thing that's alleged by the plaintiff as being problematic with respect to his ultimately contracting COVID, is the plaintiff wants this court to determine basically that getting COVID in a detention facility is per se an Eighth Amendment violation. And this court should not go down that track. I concur, Judge Wilkinson, that that is likely to lead to many, many lawsuits by inmates simply on the issue of having contracted COVID, as have many members of the public because of the time of the pandemic and then even after that. So what's your position on the voluntariness question? Is it your position that the voluntary aspect of this is enough in and of itself to defeat Eighth Amendment claim, or is it that that's a fact here that should be taken into consideration? Are you asking us to draw a bright line or consider that as one fact in the record? Your Honor, I think you should consider it as one fact. The appellant does list some cases that indicate that the voluntariness factor doesn't mitigate or cut against a determination of an Eighth Amendment violation when there's an extreme risk from that. And they cite a case where a woman is working in a laundry and ends up getting hit by a cart in a laundry facility is such an unusual or unknowable risk that it defeats, effectively, voluntariness. Your Honor, I'm not inclined to adopt that. But I think that... I took Judge Caldwell's question to sort of ask you what your position is, not what other courts have said, but what's your position with respect to voluntariness? Are there limits to voluntariness defeating an Eighth Amendment claim? And if so, what do you think those limits are? I mean, we talked earlier about are there like limiting principles there for you or is voluntariness sufficient? Your Honor, I can't draw that white line to say that voluntariness is sufficient. But I do think there are some limiting things. The example that was given with respect to the longest shard is an example of playing football. I think that recreational activities within detention facilities are common and therefore one has to sort of say, well, there's an assumption of risk there as there would be out if we were playing football on a regular field. If they showed up, and to use your colleague's example, they showed up and they weren't given helmets when they were playing against the guards, sort of consistent with the longest yard, right? The guards got all this nice new equipment and the inmates were given old, really pretty bad equipment. They got a helmet, but it was just barely that. And they continue to then participate knowing that information? Is that sufficient even if maybe the helmet was not as good as the guards' helmets? Your Honor, I believe that Superintendent Miletus would not allow that sort of distinction to occur in a staff inmate. Right, but we're asking hypothetical, right? The answer would be I would say no. I would say in that case the voluntariness has to be, can't be a bright line that if they're compelled to play and they suffer. But they're not compelled to play. That's the very point. Well, there is the question of how far is it voluntary? Is it voluntary to simply sign up, which Hodges did, and then he says, well, he was compelled to do X, Y, and Z during the day. In order to participate, you must do X. In order to play football, you must go on the field and you must block and tackle and run and throw, right? So if you sign up, you can't then sit on the sidelines. So that seems fair. If you sign up to work in the kitchen, you can't go sit in the library and read books the whole time, right? You have to actually work in the kitchen. But that doesn't undermine voluntariness. What Hodges essentially argues is it does undermine it. What I would say is the limiting factor is going to be that if in fact you can establish a cruel and unusual punishment as to aspects of those activities that are voluntary, then you may well have a claim under the Eighth Amendment. That's not here. So for example, if with regard to the working conditions, if on day one it was 105 degrees and they had to work 16-hour days with no water and no breaks, even if they signed up in the first place and Mike could resign after day one, it might be that the voluntariness doesn't defeat that claim. It might be, Your Honor. It sounds like you're talking about Arizona, not Virginia. If it were 115 in Virginia, then I think we'd have to look at it from a cruel and unusual punishment aspect perhaps at that point. But the allegation is simply that some of the days it was 98 to 100 degrees. He doesn't demonstrate any injury. He doesn't demonstrate anything that is significant with respect to that particular condition. And he doesn't plead the facts I'm talking about, such as no water, no breaks, or anything like that. No, Your Honor. There is none of that. And so specifically on the COVID issue, he specifically leaves out that he was not given any medical care when he got COVID. That to me would be something that would make a difference with respect to whether— You know, sometimes it's good to go back to the language of the Eighth Amendment, which speaks of cruel and unusual punishment. And with respect to this question of voluntariness, it's hard to see how it's punishment to exceed or to grant a request. And it's hard to see how it's cruel and unusual to do something that the inmate wishes. And so when you look at the—you know, we hand down all these interpretations of the constitutional language, and we wander a bit afar from the language itself. And the Eighth Amendment was reserved for cruel and unusual punishments. And having someone work in a kitchen pursuant to his own request cannot be what the framers of our Constitution had in mind. Just going back to first principles here, there's a difficulty. The voluntariness that we've been talking about has to relate in some way to punishment. And if, you know, if you say to grant something I want as punishing me, I mean, that's usually thought of as exactly the opposite, an accommodation rather than a punishment. Well, Your Honor, we would absolutely agree with that. Plus, with respect to the allegations in this particular case, you don't get to where some of the courts talk about punishment in terms of things that are different than the normal expectations of life within the detention or the prison facility. And in this case, they're not different things that are going on with respect to this workforce. He is working with others, signed up for it. He is working with others and staff. And so there is not a punishment aspect of this where he is even given a choice, a voluntary choice, you can do this horrible thing because you were disciplined or this. Do you agree that this line would be different? Obviously, it's not this case. So this is hypothetical. If he alleged that it wasn't voluntary, right? So I'm thinking of the example of, you know, telling my daughter to go pick her own switch out, right? Sort of voluntary. She gets to pick which switch it is, but it's not really voluntary. It would that make a difference if he had alleged facts that suggested that it was an involuntary choice? He was given the choice between working in the kitchen or, you know, being flogged, right? Something that obviously is hypothetical, but. Yes, Ron, I think that would get closer to cutting into the issue of voluntariness and giving a Hobson's choice. What is interesting and I think really pertinent to the first stage that this case was in is that he claims that he's got cruel and unusual punishment because he's in workforce. He indicates later to the court that he's taken out of workforce and he wants to be back in it. So it's it undercuts the what I think is really key even under 1915, which is the plausibility of his allegations. And so I know that the appellant's counsel has argued that that. Well, you have to accept his allegations on their face value and not draw any inferences. But when you read all of Mr. Hodge's allegations, they make no sense and they amount to insignificant requests for relief. And there's a further question here about the division of state and federal authority. And this is it is, after all, a state institution. And this lawsuit draws us into the absolute minutia of prison administration that we're going to be the ones that decide which inmates are assigned to the kitchen, which inmates are assigned to outside duties or this or that. Well, you know, making workplace assignments is the very essence of what a prison warden would would would do. This goes right to the heart of micromanaging a state institution to say who can go where because of this or because of of that. I mean, we're going to have I keep coming back to this is only the the leading wave of a huge number of lawsuits in which we are drawn into speculation about conditions and to work assignments and and everything else. It turns the respective balance of state and federal power right on its head. Your Honor, I think that also this court has referred in some cases to not getting into matters such as Mr. Hodges alleges that his complaint in his letter stage as as involving issues of peniological exigency. And and and that is what you have have here. And I think that's what the court has alluded to just now in terms of of of the basic internal structure workings of the jail that have gone. There is that other than the fact other than the fact that their jail was under quarantine because of covid emergency and and had to work within that. There is nothing different about Mr. Hodges here of applying hindsight because the administrators, all kinds of institutions were faced with a surprising and unprecedented epidemic, the once in a century epidemic. And a lot of them, they do the best they can. In hindsight, some of the solutions and arrangements may appear imperfect, but it's it's one thing to be sitting on a court several years afterwards, and it's another to be confronted with the situations that the pandemic posed for administrators of all kinds of institutions and to be on the spot. Your Honor, I know Colonel Malias would have appreciated those comments. What I would say to this court is that there is much that this court would hear if this matter went further. So counsel, let me ask two questions that may seem ancillary or minor, but I'd like your view on them. One is the challenge to the failure to allow the amendment of the claims. And one is whether the dismissal was with prejudice, and if so, whether it should be. Would you please address your position on those two points before your time expires? Yes, sir, thank you. With respect to the issue of the dismissal with prejudice, the court dismissed the claim regarding Eighth Amendment, dismissed that claim, and it appears that it was with prejudice. The court distinguished out its dismissal of what it called Claim 2B, where Mr. Hodges was arguing that he should have gotten work release. The court said that that was without prejudice. I say, back to the with prejudice on the first, I think it is important, and why I talked about it, that Claim 2B and 28 U.S.C. 1915 were addressed by the court. And therefore, this court can properly leave that as dismissed with respect to prejudice, which I think the court, in dismissing and not saying anything, we have to assume that that was the case. I think the important thing on those letters, I call it, Mr. Hodges was kind of the court's pen pal in this regard. Those letters don't give any additional claims of substance. You heard about in his original complaint, you heard about his COVID issue. In his original complaint, you heard about his concerns about how his grievance were addressed. And so the letters maybe provide a little bit more enlightenment, but it would be futile in a sense to require this case to go back and allow amendment for purposes of those letters. Including, what about going through his mail? Your Honor, what I would say is at this point, he claims no relief or damages in that regard. So even if there was some deliberate attempt to go through his court mail, there's no relief claim. He's out of jail at the time of his appeal. And so what would he gain from that? He doesn't allege any damages with respect to it. And so in that sense, it's insignificant. So the futility argument you say applies even if that's a new claim? Exactly, Your Honor. I think that he is, and when he makes his motion of appeal, there's nothing really new in there either. There's a little bit of fluffing out what he said previously. What is important is, and they do point out, the appellant points out that somehow he still has a damages claim. But his damages claim, if you look at it, really, he has no monetary amount. And it really relates to the fact that he didn't get paid when he was quarantined for work release, which he had no protected liberty right to have anyway, and that the adult detention center couldn't even control because it was given by the state. So, and the district court addressed that. So there's really not any damages claim, which is why I refer to anything as being insignificant. And this court has held that, you know, claiming for loss of a jumpsuit at $25 is insignificant. And so the purpose of what Mr. Hodges tries to do thwarts both the purpose of 28 U.S.C. 1915, because he's trying to make something out of nothing in order to be before this court. We have separately argued that we think the matter should be dismissed as moot, and because he's failed to do some things that the court requires. But putting that aside, the district court specifically looked at the issues that were raised. And unless you get to a per se violation of the Eighth Amendment by getting COVID and having no damages, having no residual issues, the cases that this court has looked at on well, maybe there's something in the future there. He doesn't allege that either. It was a passing issue. He doesn't allege he didn't get medical care. The contact tracing issue, I think the court can, if that's the only precaution that we should have taken, didn't take, that's not. Thank you very much, counsel. I think we understand your argument. Mr. Rosen, may I come forward? I have a question here for you generally, because you're a student at a very distinguished law school, and you're going to be going into practice. And I wanted to ask you, I have qualms about the way in which this case was litigated. And the fact that someone is pro se will only carry you so far. But in denying leave to amend, the request was vague. There was no amended complaint submitted with that motion. And even before you get to that point, there was no payment of the proper filing fee. There was no address given the court or anyone upon release. They didn't advise the court of his release in anything like a timely fashion. And so the motion to amend and whatever, you're relying upon the grace of the court and the discretion of the court in a case in which, you know, let's be honest, this was, this isn't your fault at all, but this was litigated in a very bad way. And a good practitioner, which I know you're going to be, wouldn't have litigated it in this manner at all. And so how can we fault the district judge here, given these facts? How can we fault the district judge for an abuse of discretion for denying leave to amend? Your Honor, the district court did abuse its discretion in failing to leave to amend because as the Supreme Court has held in Froman against Davis, leave to amend should be freely given. And as the context indicates within the JA itself, Mr. Hodges was essentially told to wait before filing his leave to amend request. And that's because the district court on JA page 16 said that he was going to dismiss the request to leave to amend until the IFP designation was stated. But normally when you've moved for leave to amend, the best thing to do is to include and attach the amended complaint to the motion for leave to amend. And if you can't do that, at least have an attachment that indicates why you want to leave to amend. And he didn't do that. And then that's only the beginning of the way that the individual related to the court. And as I say, you make some allowances for a pro se litigant, but those allowances are not infinite, are they? No, Your Honor. And they're also not infinite in this case either. As Mr. Hodges alleges in his second leave to amend request, which appears on JA pages 19 and 20, he also wished to add a retaliation claim for filing the 1983 claim in the first place. And although they're not heartfully drafted, as this court indicated in labor against Harvey, even though a pro se complaint leave to amend request is not artfully drafted, it still gives it the benefit of the doubt. But a serious litigator would have made some effort to turn square corners. And your opposing counsel said some things that this lawsuit is trying to make something out of nothing. And in terms of the injury suffered or in terms of any real harm that was done or whatever, her comments seem to me to be quite astute. That when you look at the case as a whole, there really is an effort to make something out of nothing. You know, where's the beef? Where's the substance to the lawsuit, huh? Your Honor, as the complaint has appeared to the district court at the time, that's why the inferences must be drawn in the light most favorable to Mr. Hodges. He's not a lawyer such as us before you today. And he doesn't have the same legal tools that are available to him. That's why generally courts draw the inferences in the light most favorable to him. And to the issue that opposing counsel has raised, these are a lot of dealing with facts. And that highlights the fact that this dismissal Can I get your thoughts on one other unrelated issue we haven't focused on? This is his nonpayment in June of 2022, right? The IFP statute required him to make payments, whatever it is, 20% of his account. And yet in June, he's got $200 and he spends $190 of it in the commissary. So prohibiting the Department of Corrections from making the payment that he was required to make by statute. Do you first agree that he was required to make that payment and that he failed to do so? Your Honor, I frankly am unfamiliar with whether or not he was actually required to make that payment. Of course, he does have to comply with the IFP designation. Well, assume for a minute that he did have to do it because that's what the statute says. Um, what do you suggest we do about that? So he failed to make the payment. Just accept that as a hypothetical. He was required to. That certainly gives us the authority to dismiss his appeal. And even I think to this day, he's not remedied that failure to make the payment that was required. And so I just want to get your take on what we should do about that. I mean, typically what we would do if somebody fails to do what the statute requires, we would dismiss the appeal for failure to have complied with the IFP statute. Certainly, Your Honor. However, because that's the district court's own ruling and the district court's ruling and determination of IFP status, it'd be best for the district court to determine whether or not he's in compliance with the IFP designation at that time. And it also, as far as the failure to advise the court of his whereabouts, actually, as indicated in the district court order for IFP designation, it was the job of the jail custodian in order to notify the court that he had, in fact, been released, not Mr. Hodges himself. And that appears in the supplemental appendix that opposing counsel also raises. Thank you, Counselor. Thank you. All right. We thank you. I would like to thank both counsel for their fine arguments. And Mr. Rosenmayer, it was a pleasure to have you. And you've obviously prepared your argument very diligently and you've given a fine argument. I always enjoy having student counsel here. And you certainly acquitted yourself in a way that the law school can be very proud of. So if you would come up and fist bump me and have these good folks come down and say hi to you, I'd appreciate it. Thank you both.
judges: J. Harvie Wilkinson III, Julius N. Richardson, A. Marvin Quattlebaum Jr.